**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SIAH FLEMISTER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 20-1391** |
| | : | |
| **MERAKEY IDD PHILADELPHIA** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                    **November 9, 2020**

  Siah Flemister claims her former employer Merakey IDD Philadelphia fired her because of her Liberian national origin rather than as a disciplinary measure.  The remaining issue is whether her former employer discriminated against her.  The parties engaged in discovery. Merakey now moves for summary judgment arguing Ms. Flemister failed to establish a *prima facie* case of discrimination based on national origin, and, even if she did establish a *prima facie* case of national origin discrimination, she failed to demonstrate its articulated, legitimate, non-discriminatory reason for her termination is pretextual.  Ms. Flemister raises conclusory challenges.  We scrutinized the adduced evidence.  We find no genuine issue of material fact precluding judgment for Merakey on Ms. Flemister's claim for discrimination based on national origin.  We grant Merakey's motion for summary judgment and dismiss the case.

## I.  Undisputed Facts[1]

  Ms. Flemister is Liberian.[2]  On July 17, 2017, Merakey hired Ms. Flemister as a Day Program Support Counselor.[3]  Merakey is an agency providing services to individuals with intellectual and developmental disabilities, including residential services, day program services, supported employment, supported living, and family living.[4]  Merakey refers to the individuals it services as "consumers."[5]  Merakey maintains two primary programs: the Day Program and the Residential Program.[6]  Ms. Flemister worked in the Day Program which provides eight hours of

education and daily living support to its consumers in a classroom setting as well as field trips into the community.[7]

Merakey hired Ms. Flemister as a "replacement counselor" to fill-in on an as-needed basis and not assigned to a specific classroom or consumer.[8] Ms. Flemister's responsibilities included providing day-to-day direct care and support to consumers, assisting consumers with daily life activities, daily lessons to develop life skills, and taking consumers on field trips into the community.[9]

Ms. Flemister's position is covered by a collective bargaining agreement between the National Union of Hospital and Health Care Workers, District 1199C and Merakey.[10] The collective bargaining agreement governed the terms and conditions of Ms. Flemister's employment with Merakey.[11]

### *Merakey's Standards of Professional Behavior Policy.*

Merakey maintains a Standards of Professional Behavior Policy ("Policy") for its employees proscribing, among other things: "Engaging in fighting, horseplay, practical jokes or other disorderly conduct that causes or could cause injury to others or damage to property, or that could endanger the well-being of any employee, consumer, visitor or company property is prohibited"; "Threatening, intimidating or coercing others, using abusive or offensive or demeaning language, or interfering with the performance of others, are other examples of prohibited behavior"; and "To ensure a safe environment, Merakey prohibits abuse, mistreatment or neglect of a consumer."[12] Violations of the Policy may result in "disciplinary action up to and including termination."[13]

*Pennsylvania regulations governing Merakey's services.*

Merakey is governed by the Pennsylvania Code's "Intellectual Disability and Autism Manual" for providers of services to the intellectually disabled or autistic.[14] The Pennsylvania Department of Human Services (formerly Department of Public Welfare) issued a "Mental Retardation Bulletin" effective February 28, 2004.[15] The Bulletin provides the procedure for "incident management" designed to "ensure that when an incident occurs, the response will be adequate to protect the health, safety and rights of the individual" and to provide "clear and specific methodologies to ensure appropriate responses at the provider, county and State levels."[16]

Pennsylvania requires verbal abuse be reported within twenty-four hours of an occurrence. Pennsylvania defines "verbal abuse" as "a verbalization that inflicts or may inflict emotional harm, invoke fear or humiliate, intimidate, degrade or demean an individual."[17] Merakey immediately begins an investigation conducted by its Quality and Compliance Organization of an incident reported by an employee.[18] Merakey's investigators undergo training to become certified investigators in Pennsylvania.[19]

*National origin statements toward Ms. Flemister in 2017.*

Ms. Flemister alleges support counselors with whom she worked—Laverne, Tara, and Danyelle Simmons—made disparaging comments about the food she and another Liberian co-worker, non-party Clara Russell, brought to work for lunch.[20] Ms. Flemister does not claim Laverne, Tara, and Danyelle Simmons are Ms. Flemister's supervisors.

Ms. Flemister brought in "ethnic food of Liberia" for lunch and other support counselors made comments such as, "This stinks? Why do you eat this food?"[21] Ms. Flemister testified co-worker Laverne on at least one occasion said, "Why do you bring in this, quote, smelly African food?" and Danyelle Simmons said, "This African fish stinks. Why you keep bringing fish to heat

up in here when it make the whole place stink? [sic]"[22] Ms. Flemister testified "it was just their way of coming after the food. For what reason, I don't know."[23] Her admissions appear to conflict with her allegation she believed Ms. Simmons or Laverne directed these comments to her Liberian origin.[24] Ms. Flemister alleges the support counselors who commented on her food did not make similar comments to American-born employees who brought their food in for lunch.[25] Ms. Flemister provides no evidence to support this allegation.

Co-workers Laverne and Tara made comments about her accent and sometimes pretended not to understand her and said, "Speak English" and "We're not speaking African. Don't speak African."[26] Ms. Flemister also swore Laverne said on other occasions, "These people come in here and work here is from Africa [sic]. They don't know what to do in my space. Nobody should be sitting in my chair. Nobody should be working in my space" and "African people don't know how to do anything right."[27]

Mr. Flemister alleges she complained to a manager and Day Program director about the food comments but they did not "properly address" her complaints.[28] Ms. Flemister swore after complaining in August 2017 to Brian Hancock, supervisor of the Day Program, about Laverne's comments he or another supervisor assigned Ms. Flemister to a different classroom away from Laverne.[29] Ms. Flemister agreed after Supervisor Hancock assigned her to a room away from Laverne, she heard no more comments about the food and Africans.[30]

Ms. Flemister admits she never complained to Merakey's Human Resources about comments related to food or being African and no one other than Laverne, Tara, and Danyelle Simmons ever made any negative comments about her food.[31]

Ms. Flemister did not work in Laverne or Tara's classroom after late 2017 and her situation "got better" having moved away from them and into the classroom of another co-worker, Patrice,

who enjoyed her African food.[32] When asked about her allegation she complained in early March 2018 about Laverne's comments, Ms. Flemister testified she "probably" made her complaints in 2017.[33] She testified she may have made a complaint in March 2018 regarding either a food comment, a "speak English" comment, or a comment from Laverne telling her she could not sit in a certain seat on a field trip bus, but cannot specifically recall.[34] Ms. Flemister testified the seat on the bus comment did not refer to her being Liberian or African.[35]

### *March 14, 2018 verbal altercation between Mses. Flemister and Simmons.*

On March 14, 2018, Ms. Flemister and her co-worker Danyelle Simmons, an African-American, had a verbal altercation in the presence of consumers.[36] While waiting to load consumers on a bus to take them into the community for daily activities, Ms. Simmons asked Ms. Flemister to move her wheelchair-bound consumer out of the way so the bus could pull into Merakey's driveway.[37] Ms. Flemister, standing next to the wheelchair-bound consumer and close to several other consumers, became upset and, in a loud voice, called Ms. Simmons, a "f***ing b***h."[38] There is no dispute Ms. Flemister used this profanity.[39]

Two other employees, Cherona Weems and Shavon Parker, witnessed the altercation and reported it to Merakey's incident hotline.[40] It is undisputed neither Ms. Weems nor Ms. Parker reported hearing Ms. Simmons use profanity.[41] Ms. Flemister contends Ms. Simmons started the altercation by using profanity.

Merakey considered the incident reportable to Pennsylvania's Department of Human Services because it involved the use of profanity in the presence of a consumer which, if founded, constitutes a rights violation.[42] Merakey put both Ms. Flemister and Ms. Simmons on leave under its Policy while it investigated the incident.[43]

***Merakey investigates the March 14, 2018 incident.***

Merakey assigned Brittany Dowling, a Quality and Compliance Organization investigator, to investigate the incident.[44] Investigator Dowling never met either Mses. Flemister or Simmons before her investigation and did not know either woman's race or national origin.[45]

Investigator Dowling interviewed employee witnesses and one consumer witness to the altercation between Mses. Flemister and Simmons.[46] Investigator Dowling considered both Ms. Simmons and Ms. Flemister "targets" of her investigation.[47] There is a dispute as to how many person Investigator Dowling interviewed; Merakey contends she interviewed eight people (seven employees and one consumer) while Ms. Flemister argues Inspector Dowling may only have interviewed five or six people and the order in which she interviewed them.[48] We cannot imagine how the number of those interviewed is a material fact, but the parties dispute the number.

It is undisputed Investigator Dowling interviewed: Ms. Weems; Ms. Parker; Ms. Simmons; Julia Whitfield, direct support professional; Laverne Smith, direct support professional; Evelyn Perry, direct support professional; Ms. Flemister; and one consumer. In addition to personally interviewing each witness, Investigator Dowling requested each witness complete a written Witness Statement Form memorializing the interview.[49] Investigator Dowling wrote the Witness Statement Form for the intellectually disabled consumer. For reasons not explained, the record does not contain a written Witness Statement Form for Ms. Weems and Ms. Parker.[50]

Ms. Weems and Ms. Parker reported hearing Ms. Flemister use profanity.[51] We have no written Witness Statement Form from either witness. The written Witness Statement Forms from Ms. Whitfield, Ms. Smith, and Ms. Perry do not report hearing or could not remember hearing, either Ms. Flemister or Ms. Simmons use profanity.[52] The consumer identified Ms. Flemister as using a profanity.

Ms. Simmons reported she asked Ms. Flemister several times to move the wheelchair-bound consumer so the program's bus could get by, but Ms. Flemister ignored her.[53] Ms. Simmons reported she commented to Evelyn Perry "she['s] acting stupid," referring to Ms. Flemister. Ms. Simmons believes Ms. Flemister heard the comment and "got hype." Ms. Simmons cannot be sure if Ms. Flemister used profanity because of the language barrier and because she really did not "pa[y] [Ms. Flemister] too much mind because [she] could not understand her."[54]

Ms. Flemister reported Ms. Simmons initiated the altercation by "scream[ing]" at her to move for the bus but Ms. Flemister could not move because she and her wheelchair-bound consumer were "boxed in." At that point, Ms. Flemister contends Ms. Simmons called her a "f***ing retarded African b***h with no common sense."[55] Ms. Flemister concedes she responded by calling Ms. Simmons a "f***ing b***h."[56] Ms. Flemister was the last witness interviewed by Investigator Dowling.[57]

After hearing Ms. Flemister's accusation Ms. Simmons used a profanity, Investigator Dowling did not ask the other witnesses if they heard Ms. Simmons use profanity.[58] She did not inquire of other witnesses because "during the investigation, I'm pretty sure I asked them for both sides of the parties. Did this person use profanity, did this person use profanity, you know, did they heard [sic] it from either side."[59]

Investigator Dowling concluded Ms. Flemister used profanity.[60] Investigator Dowling could not substantiate Ms. Flemister's assertion Ms. Simmons used profanity.[61]

### *Investigator Dowling delivers her conclusion to Merakey's findings committee.*

Investigator Dowling gathered all the witnesses' statements and presented the results of her investigation at a Merakey "findings meeting" attended by a committee comprised of Alexandra Canavan, Merakey's Regional Executive Director, Tamesha Wilson, Direction of the

Day Program, and several representatives of the Human Resources Department.[62] Ms. Canavan testified findings meetings generally follow the same structure: the investigator, here Investigator Dowling, reads witness testimony to the committee; the investigator identifies other documents relevant to the case; and the committee has an opportunity to ask questions of the investigator.[63] Ms. Flemister disputes Investigator Dowling read through all witness statements and answered questions from the committee, citing Investigator Dowling's deposition testimony she cannot recall whether she gave the committee copies of the witnesses' written statements and whether she read the witnesses' written statements in their entirety or provided a summary.

The findings committee approved Investigator Dowling's finding Ms. Flemister used profanity in the presence of a consumer causing a rights violation to the consumer.[64] The findings committee based its conclusion on Ms. Flemister's admission she used profanity and "multiple corroborating witness statements."[65] It also concluded Ms. Flemister's allegation Ms. Simmons used profanity, without other witness corroboration, insufficient to find Ms. Simmons did so.[66] Ms. Flemister disputes the findings committee knew of her allegation regarding Ms. Simmons use of "discriminatory language" and "multiple" witnesses corroborated Ms. Flemister's use of profanity.[67]

Merakey reported Ms. Flemister's use of profanity in the presence of a consumer to the Pennsylvania Department of Human Services.[68]

### Merakey terminates Ms. Flemister.

After the findings meeting, Ms. Canavan consulted with the Human Resources Department and decided to terminate Ms. Flemister's employment.[69] There is no dispute Ms. Canavan is the final decision-maker for the termination of employees in Merakey's Day Program.[70] Investigator Dowling did not participate in determining disciplinary action.[71]

Ms. Canavan terminated Ms. Flemister's employment for use of profanity in the presence of a consumer, a rights violation.[72] Ms. Canavan issued a counseling letter to Ms. Simmons for failing to deescalate the altercation with Ms. Flemister.[73] Merakey's Executive Director Wilson (who attended the findings meeting) notified Ms. Flemister of her termination.[74]

Ms. Flemister filed a charge of national origin discrimination with the Equal Employment Opportunity Commission dual filed with the Pennsylvania Human Relations Commission. After receiving a right-to-sue letter from the EEOC, Ms. Flemister sued Merakey alleging discrimination and a now-abandoned retaliation claim under Title VII, 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* [75]

## II.    Analysis[76]

Ms. Flemister alleges Merakey terminated her because of her Liberian origin instead of Ms. Simmons who is African American.[77] Ms. Flemister's complaint focuses on her co-workers' commentary about her African food which she believes evidences discrimination based on her national origin.[78] Ms. Flemister abandons her initial claims at the summary judgment stage, and now argues Merakey treated her, a Liberian, differently than Ms. Simmons, an African American, based on an unpleaded theory Merakey's investigation into the altercation between her and Ms. Simmons is based on an unfair investigation.[79] Ms. Flemister advances this theory notwithstanding the record evidence: (1) she admitted to using profanity, a terminable offense; (2) Merakey's Investigator Dowling interviewed eight witnesses, including Ms. Flemister who had full opportunity to provide her version of the altercation; and (3) at the conclusion of the investigation, Investigator Dowling obtained two employee witnesses and one consumer witness who corroborated Ms. Flemister's admitted use of profanity but could not corroborate from any witness Ms. Simmons used profanity other than Ms. Flemister's allegation.[80]

Merakey moves for summary judgment arguing (1) Ms. Flemister cannot establish a *prima facie* case of national origin discrimination; and (2) even if Ms. Flemister establishes a *prima facie* case of discrimination, there is no evidence Merakey's articulated legitimate non-discriminatory reason for her termination is pretext for discrimination.[81]

Ms. Flemister responds (1) she meets her burden to establish a *prima facie* case of discrimination because Merakey treated Ms. Simmons more favorably than her; the decision-maker knew her national origin and, even if the decision-maker did not know, she can establish discrimination under a "cat's paw" theory; and (2) she can show pretext through Merakey's "unfair investigation."[82]

Both parties agree the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*[83] applies to Ms. Flemister's national origin employment discrimination claim.[84] Under *McDonnell Douglas*, an employee must first establish a *prima facie* case of discrimination.[85] If the employee meets her burden to show a *prima facie* case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for terminating the employee.[86] If the employer meets its burden of articulating a legitimate, nondiscriminatory reason for termination, the burden shifts back to the employee to show the employer's reason is a pretext for discrimination.[87]

### A. Ms. Flemister fails to establish a *prima facie* case of national origin discrimination.

Merakey first argues Ms. Flemister fails to establish a *prima facie* case of discrimination.[88] To establish a *prima facie* case of employment discrimination under Title VII, Ms. Flemister must show: "(1) she belongs to a protected class; (2) she was qualified for the position; (3) she was the subject of an adverse employment action; and (4) the adverse employment action gives rise to an inference of discrimination."[89] "The 'central focus' of the *prima facie* case 'is always whether the

employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'"[90]

Merakey does not contest the first three elements of the *prima facie* case; it challenges only the fourth element—the adverse employment action does not give rise to an inference of discrimination.[91] "To establish the fourth element, a plaintiff may either: '(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action.'"[92]

Merakey argues Ms. Flemister cannot show the fourth prong of the *prima facie* case of discrimination because (1) Ms. Canavan, the decision-maker terminating her employment did not know Ms. Flemister's national origin; and (2) there is no evidence giving rise to an inference of discrimination because Merakey did not treat similarly situated comparators more favorably and there is no causal nexus between Ms. Flemister's national origin and her termination.[93] We address the arguments in turn.

### Decision-maker's knowledge of Ms. Flemister's Liberian origin.

Merakey first argues none of the "relevant company actors" knew of Ms. Flemister's national origin at the time Merakey decided to terminate her employment and, absent knowledge, Ms. Flemister cannot establish a *prima facie* case of discrimination.[94]

In *Geraci v. Moody-Tottrup, Int'l, Inc.*, our Court of Appeals directs an employer's knowledge of a plaintiff's membership in a protected class relevant to the *prima facie* case of discrimination: "The traditional [*McDonnell Douglas*] presumption quite properly makes no reference to the employer's knowledge of membership in a protected class because, in the vast

majority of discrimination cases, the plaintiff's membership is either patent (race or gender), or is documented on the employee's personnel record (age)."[95] In *Geraci*, the employee sued her employer for terminating her because of her early stage pregnancy.[96] Judge Ambrose granted summary judgment to the employer finding the employee failed to show disputed facts of a *prima facie* case of discrimination because she could not show her employer knew of her pregnancy when it terminated her. Our Court of Appeals distinguished the case from other employment discrimination cases because the employer could not know of the pregnancy at the time.[97] It found "[w]e cannot presume that an employer most likely practiced unlawful discrimination when it did not know that the plaintiff even belonged to the protected class.[98] The employer's knowledge, in this class of cases, is a critical element of the plaintiff's *prima facie* case.[99] Indeed, it is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant, and in this situation the bare *McDonnell Douglas* presumption no longer makes sense."[100]

Our Court of Appeals continued holding the relevant decision-maker must know of an employee's protected status to hold the employer liable for intentional discrimination. In *Sarullo,* our Court of Appeals affirmed summary judgment in the employer's favor because the decision-maker lacked knowledge of the employee's national origin and age.[101] In *Harris v. Dow Chemical Co.*, our Court of Appeals affirmed summary judgment in favor of an employer in a failure to hire case where the interviewee alleged the employer's human resources manager did not interview her for a position based on her race and age.[102] Our Court of Appeals found no evidence to rebut the human resource manager's testimony she did not know the potential employee's race or age when declining to interview her, recognizing its holdings in *Sarullo* and *Geraci* "an adverse employment action does not in isolation raise such an inference; rather, the inference may be raised

only if the relevant decision-maker has knowledge of the plaintiff's status as a protected class member."[103]

Although Merakey's brief refers to "relevant company actors," it contends the single decision-maker, Ms. Canavan, did not know Ms. Flemister's national origin and never met or spoke with Ms. Flemister.[104]

Ms. Flemister does not dispute Ms. Canavan's testimony disavowing knowledge of Ms. Flemister's national origin.[105] Ms. Flemister instead challenges Ms. Canavan's credibility; she argues we should not believe the "relevant decision makers" did not know her national origin.[106] Ms. Flemister argues she speaks with an accent and Investigator Dowling must have known she is not of American origin because Investigator Dowling interviewed her and would have heard her accent.[107] Ms. Flemister argues a "jury needs to hear" her speak to "assess whether [Investigator] Dowling can be believed when she testifies that she did not know [her] national origin."[108]

But there is no evidence Investigator Dowling decided to terminate Ms. Flemister. The record's evidence shows Ms. Canavan as the decision-maker and she testified she did not know Ms. Flemister's national origin and never met her. At the summary judgment stage, Ms. Flemister must identify facts in the record to make a sufficient showing on the essential elements of her discrimination claim for which she has the burden of proof. Ms. Flemister does not meet her burden.

Perhaps realizing the weakness of her argument, Ms. Flemister argues she can establish discrimination under a "cat's paw" theory of liability. Under this theory, an employee may hold her employer liable "for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision."[109] Courts may hold an employer liable under the "cat's paw" theory, where the decision-maker is free from

discriminatory animus but evidence proves another employee, allegedly motivated by discriminatory animus, influenced the decision to terminate the employee.[110]

Ms. Flemister argues Investigator Dowling interviewed her about the altercation with Ms. Simmons; in the interview, Ms. Flemister admitted to using profanity but reported Ms. Simmons first used profanity; Investigator Dowling failed to "do anything" with "this new information"; and Ms. Canavan based her decision on Investigator Dowling's investigation.[111] Ms. Flemister argues because Investigator Dowling did not go back and question witnesses regarding Ms. Flemister's accusation against Ms. Simmons, there is a genuine issue of fact regarding whether Investigator Dowling influenced Ms. Canavan to terminate Ms. Flemister based on discriminatory animus toward her Liberian national origin.[112]

There is no evidence to support Ms. Flemister's argument of liability under the cat's paw theory. Investigator Dowling investigated the facts; she concluded Ms. Flemister used profanity and admitted she could not corroborate Ms. Flemister's accusation Ms. Simmons used profanity.[113] Investigator Dowling presented her investigation at the findings meeting.[114] Ms. Canavan, with Merakey's human resources, decided to terminate Ms. Flemister for her admitted use of profanity in the presence of a consumer.[115] There is no evidence of Investigator Dowling's influence.

Ms. Flemister appears to argue she adduced evidence of Investigator Dowling's discriminatory animus because she reported to Investigator Dowling an alleged comment by Ms. Simmons calling her an "African b***h," and because Investigator Dowling did not investigate to Ms. Flemister's liking.[116] There is no evidence of Investigator Dowling's discriminatory animus which then influenced Ms. Canavan's decision. To the contrary, Ms. Flemister alleges comments by her co-workers regarding her African food show discriminatory animus.[117] But Investigator Dowling is not alleged to have made such comments. The record shows Investigator Dowling

investigated the altercation between Ms. Simmons and Ms. Flemister, nothing else. Ms. Flemister fails to meet her burden of showing a genuine issue of fact the decision-maker, Ms. Canavan, knew her Liberian national origin.

### *There is no other evidence supporting an inference of discrimination.*

Merakey next argues there is no evidence the circumstances of her termination give rise to an inference of discrimination.[118] "'Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside the relevant class.'"[119]

Merakey argues there is no record evidence it treated a similarly situated employee, here Ms. Simmons, more favorably than Ms. Flemister.[120] In its reply brief, Merakey argues Ms. Simmons is not an appropriate comparator because Ms. Flemister admitted using profanity; there is no evidence Ms. Simmons used profanity other than Ms. Flemister's testimony; Merakey investigated and no witness corroborated Ms. Flemister's claim; and there is no evidence Merakey considered either Ms. Flemister's or Ms. Simmons's national origin. We need not determine whether Ms. Simmons is an appropriate comparator because, even if she is one, there is no evidence Merakey treated Ms. Flemister differently based on national origin.

Merakey cites to its investigation of the altercation between Ms. Simmons and Ms. Flemister.[121] The investigation revealed two employees witnesses and one consumer witness reported hearing Ms. Flemister use profanity; no witnesses other than Ms. Flemister reported hearing Ms. Simmons use profanity; and Ms. Flemister admitted to using profanity.[122] Investigator Dowling testified she questioned witnesses "for both sides," asking each witness whether "did this person" and "did this person" use profanity and "did they hear it from either side."[123]

Ms. Flemister argues there is a factual dispute whether Investigator Dowling "fully investigated" Ms. Simmons' alleged remark; whether Investigator Dowling conducted a complete and fair investigation; and baldly states, with no evidence, "nobody really investigated the allegation" regarding Ms. Simmons and questions Investigator Dowling's "judgment and skills."[124] Ms. Flemister requests we find a disputed issue of fact based on her disagreement with the way Investigator Dowling conducted the investigation.[125] There is no evidence Investigator Dowling somehow improperly conducted her investigation because of Ms. Flemister's national origin nor evidence the investigation is somehow discriminatory. There is no evidence to support a causal nexus between Ms. Flemister's termination and her national origin from which a reasonable juror could infer Merakey acted with discriminatory animus. Even if we accept Ms. Flemister's conclusory allegation Investigator Dowling's investigation is "not really an investigation"—and there is no evidence of it—there is no evidence to support an inference of discrimination in the allegedly defective investigation and subsequent termination.

There is similarly no evidence remarks by Laverne, Tara, and Ms. Simmons in 2017 regarding "smelly African food" has a causal nexus to her termination.[126]  None of the women who allegedly made comments about Ms. Flemister's food supervised her. There is no allegation Investigator Dowling or Ms. Canavan made any such comments or were even aware of them. Ms. Flemister admitted her supervisor moved her away from her co-workers after she complained about the comments and did not experience further problems.[127] Ms. Flemister ignores the relevance of the food comments in her opposition to summary judgment, considering them part of her now-abandoned retaliation claim.[128]

Ms. Flemister fails to carry her burden on the fourth prong of the *prima facie* case and we enter summary judgment in favor of Merakey.  But even if Ms. Flemister satisfied her *prima facie*

case, she fails to show evidence of pretext requiring us to enter summary judgment in favor of Merakey as discussed below.

**B.  Even if Ms. Flemister established a *prima facie* case, there is no evidence of pretext.**

Assuming Ms. Flemister established a *prima facie* case of national origin discrimination, the burden shifts to Merakey to articulate a legitimate, nondiscriminatory reason for her termination. Merakey's articulated reason for Ms. Flemister's termination is her use of profanity in the presence of a consumer during an altercation with Ms. Simmons.[129] Ms. Flemister admitted to using profanity.[130] The use of profanity in the presence of a consumer is a terminable offense under Merakey's policies.[131]

Having articulated a legitimate, nondiscriminatory reason for termination, the burden shifts back to Ms. Flemister to show Merakey's reason is pretext for discrimination. To survive summary judgment, Ms. Flemister "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Merakey's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Merakey's] action."[132]

On the first *Fuentes* prong, evidence must show "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons."[133] On the second *Fuentes* prong, "the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [protected class] was a motivating or determinative factor in the employment decision."[134]

Merakey, for the same reasons as Ms. Flemister's failure to meet the fourth prong of the *prima facie* case, argues it is undisputed Ms. Canavan terminated Ms. Flemister for the use of profanity in the presence of a consumer in violation of Merakey policy.

Ms. Flemister argues she can show pretext because of Investigator Dowling's failure to conduct a fair investigation. Again, Ms. Flemister argues Investigator Dowling's investigation is unfair because Investigator Dowling "ignored" the allegation of Ms. Simmons' use of profanity. First, there is no evidence Investigator Dowling ignored Ms. Simmons' use of profanity. Ms. Flemister does not agree with Investigator Dowling's investigation methods. She believes Investigator Dowling's failure to circle back with the witnesses after Ms. Flemister's accusation against Ms. Simmons shows she ignored these allegations. But Investigator Dowling explained she had already asked each witness whether either Ms. Flemister or Ms. Simmons used profanity; no one heard Ms. Simmons use profanity except Ms. Flemister. Investigator Dowling testified she could not corroborate Ms. Simmons' use of profanity.

The authority cited by Ms. Flemister does not support her argument. Ms. Flemister cites *Wheat v. Fifth Third Bank*, a decision from the United States Court of Appeals for the Sixth Circuit reversing summary judgment in favor of an employer in a race discrimination case.[135] The employer's articulated a legitimate, nondiscriminatory reason for firing the employee based on his refusal to cooperate in an investigatory interview conducted by the employer into an altercation between plaintiff and another co-worker. But the evidence showed the investigator "never offered the plaintiff an opportunity to give his side of the story, an opportunity" given to the co-worker.[136]

In *Dewitt v. Southwestern Bell Telephone Company*, the United States Court of Appeals for the Tenth Circuit affirmed the entry of summary judgment in favor of the employer.[137] The court rejected the employee's argument the employer's failure to conduct a fair investigation into

the basis for termination raised an inference of pretext.[138] While the court recognized "a 'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext," an employer "may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version of events."[139] "But an employer may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version of events.'"[140]

Investigator Dowling interviewed Ms. Flemister and ask her to explain the altercation with Ms. Simmons. Ms. Flemister cites other cases where pretext may be shown when there is no attempt to interview an employee to obtain her side of the story or where decision-makers rely on "one-sided" information, including refusing the terminated plaintiff to explain her version of the events causing termination. But that is not what happened here. Investigator Dowling interviewed Ms. Flemister and seven other witnesses. Ms. Flemister provided her version of the altercation and she admitted using profanity. Investigator Dowling could not corroborate Ms. Simmons' use of profanity. Unlike the cases cited by Ms. Flemister, there is no evidence Investigator Dowling failed to interview Ms. Flemister or failed to obtain her side of the story.

Ms. Flemister must point to some evidence from which the jury could reasonably either disbelieve Merakey's reason for termination or believe an invidious discriminatory reason is more likely than not a motivating or determinative cause of its decision to terminate Ms. Flemister. As our Court of Appeals reminds us "[w]e do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not

interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."[141]

There is no evidence Merakey's legitimate, non-discriminatory reason for its termination of Ms. Flemister for using profanity in the presence of a consumer is pretext. Ms. Flemister fails to meet her burden to show pretext.

## III. Conclusion

Ms. Flemister has not adduced evidence creating a genuine issue of material fact which would allow us to deny Merakey's motion for summary judgment. The material facts are undisputed. We find no evidence of discrimination based on national origin. We grant Merakey's motion and dismiss Ms. Flemister's discrimination claims.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. Merakey filed its Motion for summary judgment and supporting memorandum of law at ECF Doc. No. 22; its SUMF at ECF Doc. No. 21; and appendix at ECF Doc. No. 19-1. Ms. Flemister responded to Merakey's Motion at ECF Doc. No. 27 and responded to Merakey's SUMF at ECF Doc. No. 27-1. Ms. Flemister submitted a Counterstatement of Facts at ECF Doc. No. 29 ("Counterstatement"). References to the appendix are by Bates number, for example, "Appendix 1a."

[2] ECF Doc. No. 29, Counterstatement at ¶ 3.

[3] ECF Doc. No. 21, Merakey SUMF at ¶ 3.

[4] Merakey SUMF at ¶ 2. Ms. Flemister brought this action against "Merakey USA." In its answer to Ms. Flemister's complaint, Merakey asserted: "The previously named defendant, Merakey USA, was not a proper defendant as Plaintiff did not work for Merakey USA and, as such, the Complaint fails to state a claim upon which relief may be granted or for which the damages sought can be awarded against Merakey USA." ECF Doc. No. 8 (Sixth Affirmative Defense). We amended the caption to reflect the proper party, Merakey IDD Philadelphia. ECF Doc. No. 4.

[5] Merakey SUMF at ¶ 2.

[6] *Id.* at ¶ 4.

[7] *Id.*

[8] *Id.* at ¶ 3.

[9] *Id.* at ¶ 5.

[10] *Id.* at ¶ 11.

[11] *Id.* at ¶ 11.

[12] *Id.* at ¶ 8; Appendix at 266a–267a, ¶¶ 7(l), 7(m), 10(a), ECF Doc. No. 19-1.

[13] Merakey SUMF at ¶ 9; Appendix 267a, ¶ 12(d).

[14] 55 Pa. Code Part VIII.

[15] Merakey SUMF at ¶ 14; Appendix 402a–425a.

[16] Appendix 403a.

[17] Appendix 404a.

[18] Merakey SUMF at ¶ 16.

[19] *Id.*

[20] ECF Doc. No. 1 at ¶ 20. Ms. Flemister does not provide us with the last names of Laverne and Tara.

[21] *Id.* at ¶¶ 21-22.

[22] Appendix 113a, at p. 110-11.

[23] *Id.*

[24] ECF Doc. No. 1 at ¶ 23.

[25] *Id.* at ¶ 24.

[26] Appendix 113a at p. 112.

[27] Appendix 113a-114a at p. 113-114.

[28] ECF Doc. No. 1 at ¶¶ 25-28.

[29] Appendix 115a-116a at p. 115-116, 119a at p. 134-137.

[30] Appendix 116a at p. 123-124.

[31] Appendix 116a at p. 124-125.

[32] Appendix 119a at p. 136.

[33] Appendix 119a at p. 136-137.

[34] Appendix 120a at p. 139.

[35] Appendix 120a at p. 139-140.

[36] Merakey SUMF at ¶¶ 21-22.

[37] *Id.* at ¶ 23.

[38] *Id.* at ¶ 24.

[39] Flemister response to SUMF, ECF Doc. No. 27-1 at ¶ 24.

[40] Merakey SUMF at ¶ 25; Counterstatement at ¶ 32.

[41] Merakey SUMF at ¶ 26.

[42] *Id.*

[43] *Id.* at ¶ 27.

[44] *Id.* at ¶ 28.

[45] *Id.* at ¶ 29; Appendix 212a.

[46] Merakey SUMF at ¶ 30.

[47] Appendix 427a-432a.

[48] Merakey SUMF at ¶ 30; Flemister response to SUMF, ECF Doc. No. 27-1 at ¶ 30.

[49] Merakey SUMF at ¶ 30.

[50] Appendix 435a–448a.

[51] Appendix 218a.

[52] Appendix 440a, 442a, 447a.

[53] Appendix 438a–439a.

[54] *Id.*

[55] Appendix 445a-446a.

[56] Appendix 446a.

[57] Appendix 219a-220a.

[58] Appendix 220a.

[59] *Id.*

[60] Merakey SUMF at ¶ 34; Appendix at 432a-433a.

[61] *Id.*

[62] Merakey SUMF at ¶ 35.

[63] *Id.*; Appendix at 10a.

[64] Merakey SUMF at ¶ 35.

[65] *Id.* at ¶ 37.

[66] *Id.*

[67] Flemister response to SUMF, ECF Doc. No. 27-1 at ¶¶ 36-37.

[68] Merakey SUMF at ¶ 38.

[69] *Id.* at ¶ 39.

[70] *Id.* at ¶ 40.

[71] *Id.* at ¶ 20; Appendix at 17a.

[72] Merakey SUMF at ¶ 41.

[73] *Id.* at ¶ 42.

[74] Merakey SUMF at ¶ 43; Appendix at 453a.

[75] Ms. Flemister also initially alleged retaliatory termination for complaining of national origin discrimination under Title VII and the Pennsylvania Human Relations Act but now advises she is

no longer pursing her retaliation claim. ECF Doc. No. 27-1 at ¶¶ 47-58. In response to Merakey's Statement of Undisputed Material Facts, Ms. Flemister advises she "is no longer pursuing her retaliation claim . . .." *Id.*

[76] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson,* 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris,* 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg,* 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pitt.,* 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis,* 808 F.3d at 643 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis,* 808 F.3d at 643 (citing *Celotex Corp.,* 477 U.S. at 322-323).

[77] ECF Doc. No. 1 at 3.

[78] *Id.* at 4.

[79] ECF Doc. No. 27 at 1-2.

[80] *Id.* at 13.

[81] ECF Doc. No. 19 at 13-16.

[82] ECF Doc. No. 27 at 8.

[83] 411 U.S. 792 (1973).

[84] "The analysis for adjudicating a claim under the PHRA is identical to a Title VII inquiry." *Donaldson v. SEPTA,* 821 F. App'x 128, 130 (3d Cir. 2020) (*citing Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir. 1999)).

[85] *Hines v. Vulcan Tools Co.,* 813 F. App'x 754, 757–58 (3d Cir. 2020) (citing *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003)).

[86] *Id.* (quoting *McDonnell Douglas,* 411 U.S. at 802).

[87] *Id.* (citing *McDonnell Douglas,* 411 U.S. at 804–05).

[88] ECF Doc. No. 19 at 13

[89] *Gethers v. PNC Bank*, 813 F. App'x 746, 749 (3d Cir. 2020) (citing *Jones*, 198 F.3d at 410–11).

[90] *Sarullo*, 352 F.3d at 798 (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir.1999)).

[91] ECF Doc. No. 19 at 2-3.

[92] *Drummer v. Hosp. of Univ. of Pa.* 455 F.Supp.3d 160, 168 (E.D. Pa. 2020) (quoting *Green v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)).

[93] ECF Doc. No. 19 at 15.

[94] *Id.* at 17.

[95] 82 F.3d 578, 581 (3d Cir. 1996).

[96] *Id.* at 580.

[97] *Geraci*, 82 F.3d at 581.

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Sarullo*, 352 F.3d at 799.

[102] 586 F. App'x 843 (3d Cir. 2014).

[103] *Id.* at 846 (citing *Sarullo*, 352 F.3d at 799 and *Geraci*, 82 F.3d at 581. *See also Gerundo v. AT&T Servs., Inc.,* No. 14-5171, 2016 WL 7496155, at *4 (E.D. Pa. Dec. 28, 2016) (holding relevant decision-makers must be aware of plaintiff's protected status citing *Sarullo*, *Geraci*, and *Harris*); *Anthony v. Duff & Phelps Corp.*, No. 09–3918, 2010 WL 3222188, at *6 (E.D. Pa. Aug. 12, 2010) (granting summary judgment in favor of employer where uncontradicted evidence showed sole decision-maker never met plaintiff and did not know her national origin).

[104] ECF Doc. No. 19 at 6.

[105] ECF Doc. No. 27-1 at ¶ 44.

[106] ECF Doc. No. 19 at 13.

[107] ECF Doc. No. 27 at 2.

[108] *Id.* at 8.

[109] *Staub v. Proctor Hosp*., 562 U.S. 411, 413 (2011); *Kowalski v. Postmaster General of United States*, 811 F. App'x 733, 739 (3d Cir. 2020).

[110] *Ramirez v. Palmer Twp*., 292 F.Supp.3d 609, 626 (E.D. Pa. 2018) (citing *Burlington v. News Corp.*, 55 F.Supp.3d 723, 731 (E.D. Pa. 2014)).

[111] ECF Doc. No. 27 at 2.

[112] ECF Doc. No. 19 at 23.

[113] *Id.*

[114] ECF Doc. No. 29 at 1-2.

[115] ECF Doc. No. 27 at 2.

[116] *Id.*

[117] ECF Doc. No. 1 at 4.

[118] ECF Doc. No. 19 at 1.

[119] *May v. PNC Bank*, 434 F.Supp.3d 284, 296 (E.D. Pa. 2020) (quoting *McCormick v. Allegheny Valley Sch.*, No. 06-3332, 2008 WL 355617, at *9 (E.D. Pa. Feb. 6, 2008)).

[120] ECF Doc. No. 19 at 15.

[121] *Id.* at 13-14.

[122] *Id.* at 11.

[123] ECF Doc. No. 27 at 2.

[124] *Id.* at 5-6.

[125] *Id.* at 5.

[126] ECF Doc. No. 1 at 7.

[127] ECF Doc. No. 19 at 3.

[128] *Id.* at 9.

[129] *Id.* at 11.

[130] *Id.*

[131] *Id.* at 15.

[132] *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

[133] *Willis*, 808 F.3d at 644–45 (quoting *Fuentes*, 32 F. 3d at 764).

[134] *Peake v. Pa. State Police*, 644 F. App'x 148, 152–53 (3d Cir. 2016) (quoting *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644–45 (3d Cir.1998)).

[135] 785 F.3d 230 (6th Cir. 2015).

[136] *Id.* at 240.

[137] 845 F.3d 1299, 1320 (10th Cir. 2017).

[138] *Id.* at 1307.

[139] *Id.* at 1314 (citations omitted).

[140] *Id.* (quoting *E.E.O.C. v. BCI Coca–Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 488 (10th Cir. 2006)).

[141] *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (quoting *McCoy v. WGN Cont'l Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992)).